**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Masum Vijan, | No. CV 16-04513-PHX-DGC (MHB) |
| Plaintiff, | |
| v. | **ORDER** |
| Corizon Health Services, et al., | |
| Defendants. | |

Plaintiff Masum Vijan, who was formerly confined in the Arizona State Prison Complex-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Carrie Smalley, Thomas Dannemiller, and Itoro Elijah move for summary judgment. (Doc. 32.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 34), and he opposes the Motion. (Doc. 35.) The Court will grant the Motion for Summary Judgment in part and deny it in part.

**I.    Background**

On screening of Plaintiff's First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment deliberate indifference claim in Count One against Defendants Smalley, Dannemiller, and Henley, and in Counts Two and Three against Defendant Elijah, and directed them to answer the claims. (Doc. 9.) Plaintiff failed to serve Henley, and the Court dismissed Henley on May 9, 2018. (Doc. 21.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact …, the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant

summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e). The Court may not grant summary judgment by default, even if there is a complete failure to respond to the motion. *See Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013).

## III. Facts[1]

### A. Plaintiff's Pre-Hospitalization Treatment

On August 9, 2015, Plaintiff submitted an Emergency Health Needs Request (HNR) addressed to Defendant Dannemiller, stating that he had been requesting for several weeks to see the medical department about a severe lung infection that would not go away. (Doc. 33-1 at 37.)[2] Plaintiff stated in the HNR that he had been told that he might be able to receive antibiotics through Dannemiller, but Plaintiff could not "get past the [CO II] in order to see [Dannemiller]." (*Id.*) Plaintiff asked Dannemiller to help him see a provider or obtain antibiotics "ASAP." (*Id.*) The same day, Plaintiff submitted an HNR stating that he believed he had contracted Legionnaire's or valley fever "from these dirty vents." (*Id.* at 35.) On August 10, 2015, both HNRs were returned to Plaintiff with a note signed by Dannemiller stating: "You are schedule[d] for an appointment."[3] (*Id.* at 35, 37.)

---

[1] The facts are primarily taken from Defendants' Statement of Facts and Plaintiff's medical records. Defendants argue that Plaintiff failed to comply with Rule 56.1(b) of the Local Rules of Civil Procedure because, although he filed a Controverting Statement of Facts, he failed to provide additional facts that establish a genuine issue of material fact or otherwise preclude judgment. (Doc. 38 at 2.) Defendants further contend that Plaintiff has failed to identify, with reasonable particularity, the evidence he claims precludes summary judgment. (*Id.*) Defendants argue that the Court should grant summary judgment in their favor. Contrary to Defendants' assertion, Plaintiff has pointed to several factual disputes that he contends preclude summary judgment. (*See* Doc. 35 at 5.) Furthermore, Plaintiff has identified the specific portions of his deposition testimony that he asserts establish a genuine issue of material fact. (*See* Doc. 36.) Nothing in Rule 56.1 requires the Court to grant summary judgment in favor of a party based solely on the other party's failure to comply with the Rule; indeed, the Court could not grant summary judgment by default, even if Plaintiff had completely failed to file a statement of facts or dispute Defendants' factual assertions. *See Heinemann*, 731 F.3d at 917. The Court therefore declines to grant summary judgment based on Plaintiff's failure to comply with Local Rule 56.1.

[2] The citation refers to the document and page number generated by the Court's Electronic Case Filing system.

[3] Plaintiff also submitted several HNRs concerning other medical issues, including

- 3 -

Plaintiff saw Smalley on August 11, 2015.[4]  (Doc. 8 at 5.)  Smalley "ordered chest x-rays, but nothing more."  (*Id.*)  The Health Services Encounter for the August 11, 2015 visit indicates that Plaintiff was scheduled to be seen by a nurse at sick call.  (Doc. 33-2 at 209.)  Plaintiff's medical records indicate that he saw Smalley for his regular chronic care visit for hepatitis B (HBV) and hepatitis C.  (*Id.* at 202.)  Plaintiff told Smalley that he continued to have muscle pain (myalgia) with HBV treatment, and he complained of headache, chills, and a cough.  (*Id.*)  Plaintiff was concerned that he had blood in his urine "on occasion," but none currently.  (*Id.*)  Plaintiff also complained of low back and neck pain radiating to his arms and legs, which he attributed to a 2012 prison assault.  (*Id.*)  Plaintiff reported worsening pain with any prolonged activity and described the pain as burning "to arms and legs with aching pain to back."  (*Id.*)  Plaintiff stated that he had taken naproxen with no relief.  (*Id.*)  Plaintiff's temperature was normal at 98.2; he had no wheezing, rales, or rhonchi[5]; and his vital signs were stable.  (*Id.* at 202-204.)

Smalley ordered x-rays of Plaintiff's cervical, thoracic, and lumbar spine and requested follow-up in one month for chronic care for his HBV and back pain.  (*Id.* at 207; Doc. 33-3 at 24.)  The x-rays Smalley ordered were cancelled, however, because Plaintiff was "to[o] sick to finish [the] exam[s]."  (Doc. 33-2 at 207; Doc. 33-3 at 24-29.)  Smalley also ordered a valley fever screening.  (Doc. 33-2 at 207.)  According to Plaintiff's records, the valley fever screening was cancelled; Smalley testified in her deposition that the valley

---

requesting that his hearing aid be returned, requesting to see a psychologist or psychiatrist for mental health issues, and requesting to see a provider for "massive pain."  (Doc. 33-1 at 33-34, 36, 38-39.)  An HNR Plaintiff submitted on August 6, 2015, was also returned on August 10, 2015, with a note signed by Dannemiller stating: "You are schedule[d] for an appointment."  (*Id.* at 36.)

[4] Plaintiff's medical records indicate that he saw Dannemiller on August 11, 2015. (Doc. 33-2 at 209-15.)

[5] Rales are small clicking, bubbling, or rattling sounds in the lungs and can also be described as moist, dry, fine, and coarse.  Rhonchi are sounds that resemble snoring, which occur when air is blocked or air flow becomes rough through the large airways.  Wheezing are high-pitched sounds produced by narrow airways.  *See* https://medlineplus.gov/ency/article/007535.htm (last visited July 16, 2019).

fever test was not done because Plaintiff went to the hospital on August 28, 2015.[6] (Doc. 33-2 at 207; Doc. 33-3 at 6.)

On August 13, 2015, prisoner Mark Meechum assisted Plaintiff to the medical department for pill call, where Dannemiller "was summoned" and, after seeing Plaintiff's condition, left and returned after a few minutes with antibiotics. (Doc. 8 at 5.) Plaintiff testified in his deposition that on one occasion "Mark Mekcham" wheeled Plaintiff to the medical department to hand-deliver an HNR to Dannemiller. (Doc. 33-1 at 11.) Plaintiff told Dannemiller he had been experiencing a productive cough with dark phlegm for a few weeks. (Doc. 33-2 at 210.) Plaintiff denied shortness of breath or difficulty breathing. (*Id.*) Dannemiller examined Plaintiff and found that his left lung sounds were slightly "diminished,"[7] but he was not in acute distress and had no nasal congestion or drainage. (*Id.*) Plaintiff's temperature was normal at 98 degrees. (*Id.*) Dannemiller diagnosed Plaintiff with a "community acquired" lung infection. (*Id.* at 209, 211.) Dannemiller noted that he contacted Defendant Smalley because Plaintiff's symptoms were unimproved or worsening. (*Id.* at 213.) Dannemiller obtained orders for Bactrim, an antibiotic, for ten days. (*Id.* at 211.) Dannemiller instructed Plaintiff to submit an HNR if his condition did not improve. (*Id.* at 213.)

On August 17, 2015, Plaintiff submitted an HNR to Dannemiller, stating:

> Sir, I am deathly ill. The anti[]biotics have done nothing but make my heart hurt and my kidneys hurt so bad I cannot walk. I need to be admitted into a hospital. Each day I wake up in a pool of sweat and each afternoon I develop a temperature and the fever is so bad I shake from the cold that I sometimes

---

[6] Defendants assert that Smalley did not see Plaintiff between August 13, 2015 and August 28, 2015, the day he was hospitalized. (Doc. 33-3 at 6.) They claim that during this time Smalley did not receive any HNRs from Plaintiff, nor was she ever informed that he needed to be seen again. (*Id.* at 6-7.) Smalley never received a request from a medical officer, correctional officer, or Deputy Warden to see Plaintiff between August 13, 2015 and August 28, 2015. (*Id.* at 7.) Smalley was not aware that any of Plaintiff's symptoms worsened during that time. (*Id.*)

[7] Absent or decreased breath sounds can mean there is air or fluid in or around the lungs, such as in cases of pneumonia, heart failure, and pleural effusion; increased thickness of the chest wall; over-inflation of a part of the lungs; or reduced airflow to part of the lungs. *See* https://medlineplus.gov/ency/article/007535.htm (last visited July 16, 2019).

[lose consciousness].  I am in so much pain as well and was sent home from x-ray today as the tech said I was too sick to do x-ray.

(Doc. 8 at 6.)  On August 18, 2015, prisoner Harold W. Simon and several other prisoners obtained a loaner wheelchair and assisted Plaintiff to the medical department to deliver his August 17 HNR to Dannemiller.  (*Id.*)  Nurse Wilder "summoned" Dannemiller, "who stood just inside and read the HNR" while Plaintiff and the other prisoners waited, but Dannemiller "insisted" there was nothing more he could do.  (*Id.*)  Simon and the other prisoners "demanded" that Plaintiff go to a hospital or at least be seen by Smalley.  (*Id.*)  Dannemiller left "for a minute," returned, and said, "Smalley said just to drink more water."[8]  (*Id.*)

On August 20, 2015, Simon and another prisoner, Michael Connelly, approached CO II Henley for "at least the third time" concerning Plaintiff and his need to be sent to a hospital for emergency care.  (*Id.*)  Henley only said, "I understand.  And I've already noted it in my log."  (*Id.*)  Henley agreed to "write an IR (Incident Report)," but "refuse[d] to do anything more to obtain obviously needed emergency care" for Plaintiff.  (*Id.*)  Plaintiff expected Dannemiller or Smalley "at the very least" to reschedule him for emergency x-rays or search for the results of the x-rays taken on August 17, 2015, but they apparently failed to do so.  (*Id.*)

On August 24, 2015, Plaintiff submitted another "Emergency HNR," stating:

Again I am deathly ill!  I cannot describe the terrible pain I am in[.]  My kidneys are destroyed[.] My heart hurts[.] My left lung is giving me so much pain I cannot lay or sleep on my left side[.]  Each day I develop a fever[.]  People have told me I have lost weight[.] I cannot leave my bed [except] to urinate[.]  I need my lay-in extended[.]  I cannot go to the chow hall and med in my condition[.]  Please help me please.

(*Id.* at 7.)  Simon and Connelly took the August 24 Emergency HNR and hand-delivered it to Nurse Wilder, who took it "inside" and handed it to Smalley.  (*Id.*)  Nurse Wilder

---

[8] Smalley states in her Declaration that she never told Dannemiller or any other nurse or staff member to tell Plaintiff to "drink more water."  (Doc. 33-4 at 4 ¶ 15.)

returned and told Simon and Connelly that Smalley said she was aware of Plaintiff's problems and to "tell him to drink more water." (*Id.*)

By August 24, 2015, because he was unable to "go to chow" or receive his daily "watch-swallowed" medications, Plaintiff had already missed several days of the "watch-swallowed" medications, Effexor and entecavir. (*Id.*) Dannemiller made no welfare check to see why Plaintiff was not showing up for pill calls. (*Id.*) On August 27, 2015, Simon summoned Henley to check on Plaintiff's "dire condition." (*Id.*) Plaintiff stated, "I wish I was dead," but Henley never called for emergency medical assistance, although Plaintiff asked for and clearly needed help. (*Id.* at 8.) On August 28, 2015, Plaintiff prepared another HNR, stating,

> Please tell me the results of my x-rays two weeks ago[.] I went tremendously sick and in pain and the lady took 4 x-rays and sent me home when she determined I was too sick to continue. I cannot bear the pain I am in any longer and need help and to be seen by the provider. Why have my emergency HNRs been ignored[?] I need help!

(*Id.*) Connelly hand-delivered the August 28 HNR to Dannemiller the same day. (*Id.*) Connelly told Dannemiller that Plaintiff was in serious pain, but Dannemiller "made no comment." (*Id.*)

On August 28, 2015, prisoners noticed Plaintiff had lost consciousness and alerted Henley. (*Id.*) Henley notified the medical department of an emergency and activated an Incident Command System (ICS). (*Id.*) A Barchey Unit Sergeant contacted Nurse Oyuki Uriarte and told Uriarte that Plaintiff was feeling sick and complained of difficulty breathing. (Doc. 33-2 at 196.) The Sergeant asked whether Plaintiff "could be brought up to be seen," and Uriarte said she could see Plaintiff. (*Id.*) Officers brought Plaintiff to the medical department in a wheelchair. (*Id.* at 195.) Plaintiff stated he could not breathe and had been sick for a month. (*Id.*) Nurse Uriarte observed that Plaintiff was heavily perspiring (diaphoretic), hyperventilating, and in obvious acute distress. (*Id.* at 196.) Plaintiff was "tripod breathing"—that is, leaning forward with his hands on his knees to

"optimize breathing mechanics"; his skin had an "obvious gray color"; and he had audible rales. (*Id.*) Nurse Uriarte called 911 and reassessed Plaintiff. (*Id.*) Plaintiff's skin was cool, clammy, pale, and gray, and he was diaphoretic, had difficulty speaking to Uriarte and security because of his breathing, had rales throughout the lung field bilaterally, was hyperventilating, and had a constant productive cough with "copious amounts" of yellow/foamy sputum. (*Id.*) Plaintiff was transported to the hospital by ambulance and admitted, where it was determined that he was septic.[9]

Smalley testified at her deposition that an untreated respiratory infection could cause sepsis, and an antibiotic would "[n]ot necessarily" prevent sepsis. (Doc. 33-3 at 7.) Smalley further testified that sepsis can occur within 24 hours, or it can take weeks or months, but "it's obviously a progressive disease process." (*Id.* at 8.) She testified that signs and symptoms of sepsis include tachycardia, hypotension, fever or flushing, an altered level of consciousness, cold sweats, pain, and weight loss. (*Id.* at 9.)

Plaintiff was hospitalized from August 28, 2015 to October 18, 2015 for septic shock, left tension pneumothorax, and respiratory failure. (*See* Doc. 33-2 at 178.) Plaintiff was placed on life support at the hospital, and he "had apparently died" at one point.[10] (Doc. 8 at 8; Doc. 33-1 at 20.) Plaintiff also suffered multiple organ failures because of the sepsis. (Doc. 33-1 at 20.) Plaintiff remained in intensive care for several weeks and then spent several more weeks at a Phoenix hospital before he was moved to a medical unit at ASPC-Tucson. (Doc. 8 at 9.) Plaintiff lost 70-80 pounds and was experiencing "disturbing numbness and shocking neuropathic pain," mostly on his left side, and was still recovering when he returned to ASPC-Lewis. (*Id.*)

---

[9] Neither Defendants nor Plaintiff submitted Plaintiff's records from that hospitalization.

[10] Plaintiff alleges in the First Amended Complaint that CO II Stalsworth told Plaintiff he had "apparently died." (Doc. 8 at 8.) Plaintiff testified at his deposition that an officer told Plaintiff that he had seen Plaintiff "flat line" at the hospital. (Doc. 33-1 at 20.)

## B. Plaintiff's Post-Hospitalization Treatment

Plaintiff returned to the prison on October 18, 2015 and was admitted to the infirmary. (Doc. 33-2 at 186.) Nurse Margo Boie noted that Plaintiff had been admitted for acute respiratory distress syndrome (ARDS), left pleural effusion with emphysema, chest tube insertion and removal, and septic shock secondary to pneumonia. (*Id.*) On October 19, 2015, Nurse Practitioner Daniel Ross examined Plaintiff and noted that he had suffered respiratory failure, left tension pneumothorax, and septic shock secondary to pneumonia. (*Id.* at 178.) Ross noted that "[t]his was a sudden onset of long-standing underlying problems, made worse by [Plaintiff's] in ability to breath[e] and definitely improved by the installation of a tracheostomy."[11] (*Id.*) Plaintiff remained in the infirmary until January 6, 2016. (*Id.* at 172.) Plaintiff attended physical therapy sessions while he was in the infirmary.[12] (Doc. 33-1 at 14.)

On January 6, 2016, Plaintiff saw Smalley and was discharged from the infirmary. (Doc. 33-2 at 172.) On January 13, 2016, Plaintiff saw Nurse Susan Holcomb. (*Id.* at 167-71.) At some point, Smalley placed Special Needs Orders (SNOs) for Plaintiff for bed rest (a lay in) for one year, a wheelchair, a walker, and a lower bunk/tier.[13] (*Id.* at 170.) On February 12, 2016, Smalley ordered x-rays of Plaintiff's cervical, thoracic, and lumbar spine. (Doc. 33-3 at 20.) The x-rays revealed degenerative joint and disc disease in the mid-to-lower cervical spine and lower lumbar spine, as well as minor degenerative changes to the thoracic spine. (*Id.* at 18, 21, 23.) On March 30, 2016, Plaintiff saw Smalley and complained of a cough, chest pain, and difficulty breathing. (Doc. 33-2 at 162.) Plaintiff's lungs were clear bilaterally, and he had no nasal drainage, cough, or red eyes. (*Id.*) Smalley ordered a chest x-ray and gave Plaintiff an inhaler. (*Id.* at 166.) The chest x-ray showed

---

[11] It is unclear to what "long-standing underlying problems" Ross was referring.

[12] Defendants assert that Plaintiff attended 16 offsite physical therapy sessions. (Doc. 33 at 9 ¶ 77.) Plaintiff's medical records include notes from 14 physical therapy sessions. (Doc. 33-4 at 28-66.)

[13] Defendants state that Smalley also ordered a wheelchair porter, an ADA shower, a shower chair, and an extra mattress. (Doc. 33 at 10 ¶ 80.)

an "ill defined right lower lung infiltrate." (Doc. 33-3 at 17.) The radiologist recommended follow-up in one week to ten days and to consider a CT scan if there was no improvement. (*Id.*)

On April 5, 2016, Smalley reviewed the results of the chest x-ray, diagnosed Plaintiff with pneumonia, and prescribed Levofloxacin (an antibiotic) and Guaifenesin (a cough medication). (Doc. 33-2 at 157, 160.) On April 12, 2016, Smalley saw Plaintiff for follow-up care for pneumonia. (*Id.* at 152.) Plaintiff continued to have a productive cough of yellow to brown sputum and pain in his chest with coughing. (*Id.*) Smalley ordered another chest x-ray and placed an SNO for a quad cane. (*Id.* at 156; Doc. 33-3 at 14.) The x-ray continued to show a right lower lung infiltrate that had not significantly changed from the April 4, 2016 x-ray. (Doc. 33-3 at 14.) The radiologist recommended "continued close radiographic follow up" or to "consider CT." (*Id.*) On April 18, 2016, Smalley reviewed the results of the chest x-ray, which she noted showed "persistent consolidation"; prescribed two antibiotics, amoxicillin and azithromycin; and ordered another chest x-ray. (Doc. 33-3 at 12; Doc. 33-2 at 147, 150.)

On April 27, 2016, Smalley ordered a complete blood count (CBC) with differential/platelet test and a Coccidioides (valley fever) panel. (Doc. 33-2 at 141, 144.) She documented her plan to order a chest CT scan if there was no improvement. (*Id.* at 141.) The CBC results, with one exception,[14] were within normal limits, but the Coccidioides results were abnormal and indicated Coccidioides infection. (Doc. 33-4 at 16-17, 21-22.) On May 9, 2016, Plaintiff had a follow-up chest x-ray, which showed "right sided density," suggesting "post inflammatory scarring." (Doc. 33-3 at 12.) Smalley entered an urgent request for an offsite radiology consultation. (Doc. 33-2 at 139.) The next day, Smalley diagnosed Plaintiff with valley fever and prescribed Fluconazole, an antifungal. (*Id.* at 125.)

On June 6, 2016, Plaintiff underwent a CT scan of his chest. (Doc. 33-4 at 71.) Dr. Joseph Wall observed a new mass (as compared to a chest CT that had been taken on

---

[14] Plaintiff's eosinophil count was above high normal. (Doc. 33-4 at 16-17.)

May 30, 2014) in the right upper lobe, "which was concerning for primary pulmonary malignancy." (*Id.* at 72.) Dr. Wall opined that the mass "could reflect postinfectious sequela," such as Coccidioidomycosis, and that PET/CT imaging might provide useful further assessment. (*Id.*) On June 7, 2016, Dr. Julia Barnett entered an urgent request for an offsite radiology consultation for a chest PET/CT scan. (Doc. 33-2 at 123.) On June 29, 2016, Plaintiff had a PET/CT scan. (Doc. 33-4 at 67.) Dr. Lavi Nissim observed a right precarinal lymph node, a right upper lobe pulmonary lesion, a "very tiny nodule" within the left upper lobe, and mild infiltrate within the posterior segment of the right lower lobe. (*Id.* at 68.) Dr. Nissim noted that the spiculated (spiky or pointy) appearance of the lesion as well as the elevated metabolic activity was concerning for either a metastatic nodule or primary pulmonary malignancy. (*Id.* at 69.) Dr. Nissim also noted that a metastatic lymph node was not excluded, and the infiltrate within the right lower lobe might be infectious in nature. (*Id.* at 70.) He recommended a follow-up CT scan in one year for the left upper lobe nodule. (*Id*)

On July 1, 2016, Dr. Barnett entered an urgent request for an offsite radiology consultation. (Doc. 33-2 at 118.) Elijah became Plaintiff's primary care provider on July 13, 2016. (Doc. 8 at 10.) On July 13, 2016, Plaintiff saw Dr. Barnett for his regular chronic care visit. (Doc. 33-2 at 107.) Plaintiff complained of pain running down his left leg, which he was concerned was indicative of testicular cancer recurrence or that the nodule was metastasis. (*Id.*) Dr. Barnett and Plaintiff discussed an upcoming lung biopsy, and Dr. Barnett told Plaintiff there was no evidence of testicular cancer recurrence or metastasis based on the recent PET/CT scan. (*Id.* at 112.) Dr. Barnett ordered that Plaintiff continue treatment for valley fever and hepatitis B. (*Id.* at 113.) On July 13, 2016, Dr. Barnett "recommended the biopsy" of the "tumor" in Plaintiff's right lung. (Doc. 8 at 13.)

On July 22, 2016, Plaintiff went to Maricopa Medical Center for a CT-guided biopsy. (Doc. 33 at 12 ¶ 99; Doc. 33-4 at 66.) However, Dr. Braun cancelled the procedure, noting that the nodule was in a difficult location for CT-guided biopsy and was much more amenable to bronchoscopic biopsy. (Doc. 33 at 12 ¶ 99; Doc. 33-4 at 66.) Dr. Braun noted

that if the bronchoscopic biopsy was unsuccessful, a CT-guided biopsy could be attempted, but it was a high-risk percutaneous biopsy due to the location. (Doc. 33-4 at 66.) On August 3, 2016, Dr. Barnett entered an urgent request for a pulmonology consultation before the bronchoscopy. (Doc. 33-2 at 102.) On August 18, 2016, Plaintiff saw an offsite pulmonologist, Dr. Raza. (Doc. 33-4 at 28.) Dr. Raza noted that Plaintiff had respiratory failure, a right upper lobe lesion, and pulmonary cocci. (*Id.* at 31.) Dr. Raza recommended a CT-guided biopsy and to continue Fluconazole for valley fever. (*Id.*)

On August 20, 2016, Dr. Barnett entered an offsite consultation request for the recommended CT-guided biopsy, as well as a follow up Coccidioides lab test. The Coccidioides lab test was normal, that is, negative for valley fever. (Doc. 33-4 at 13-14.) On August 23, 2016, Plaintiff saw Registered Nurse Brenda Harris in the infirmary.[15] (Doc. 33-2 at 92.) Plaintiff complained of neck and back pain and stated he "fe[lt] like [his] valley fever [was] returning." (*Id.*) On August 29, 2016, Dr. Barnett ordered a refill of gabapentin, which was set to expire on September 13, 2016 and entered a request for an offsite radiology consultation. (*Id.* at 89-90.) On September 6, 2016, Plaintiff was approved again for a biopsy of the right lung lesion. (Doc. 8 at 14.)

On September 30, 2016, Plaintiff saw Dr. Barnett for a history and physical and to discuss renewal of his gabapentin. (Doc. 33-2 at 80.) Plaintiff complained of numbness in his left thigh and asked when his biopsy would be scheduled. (*Id.*) Dr. Barnett noted that Plaintiff had 5/5 strength throughout his bilateral upper and lower extremities and that there was "no evidence of radiculopathy." (*Id.* at 80, 83.) Dr. Barnett noted that gabapentin was not indicated and would not be renewed.[16] (*Id.* at 84.) She recommended NSAIDs for Plaintiff's back pain. (*Id.*) At the time, Plaintiff was also taking Tylenol with codeine, naproxen, and tramadol for pain. (*Id.* at 104.)

---

[15] Between August 20 and 23, 2016, Plaintiff was hospitalized after suffering a rattlesnake bite to his left hand. (Doc. 33-4 at 34-65.)

[16] The record for the September 30, 2016 visit does not state the reason gabapentin was no longer indicated.

On October 20, 2016, Plaintiff went to St. Joseph's Medical Center for the CT-guided biopsy. (Doc. 33-4 at 26.) Plaintiff asserts that the specialist was not equipped to perform a bronchoscopic procedure and was forced to end the procedure due to difficulty in safely reaching the mass. (Doc. 8 at 14.) The medical note states that the procedure was cancelled because there was no safe path to the lesion due to a "1.3 cm right upper lobe pulmonary nodule in close approximation to the right upper lobe pulmonary artery." (Doc. 33-4 at 26.) The procedure was deferred, and the case was discussed with Dr. Raza. (*Id.*) After the October 20 biopsy attempt, it was noted that a chest CT would be taken in two months. (*Id.*)

On November 1, 2016, Plaintiff filed an Emergency Medical Grievance, arguing that Corizon and Elijah were being deliberately indifferent to his need for an immediate biopsy and continued to delay a physician-ordered biopsy. (Doc. 8 at 14.) Plaintiff demanded to immediately be sent to an "endoscope specialist" for the biopsy. (*Id.*) On November 9, 2016, Plaintiff filed a grievance demanding that Corizon send him for a consultation with a neurologist for a nerve study and diagnosis and treatment of severe neuropathic pain. (*Id.* at 10.) Plaintiff also stated in his grievance that his legs had shrunk and the nerve damage and pain in his left leg had been exacerbated by his hospitalization and weight loss. (*Id.*)

On November 11, 2016, Plaintiff saw Defendant Elijah in response to Plaintiff's grievance. (Doc. 8 at 15; Doc. 33-2 at 70.) Plaintiff complained of joint and bone pain. (Doc. 33-2 at 70.) Elijah noted that Plaintiff kept stating he had disseminated Coccidioides, and Elijah informed Plaintiff that although his test from May 2 had been positive, the repeat tests after Plaintiff took Diflucan had been negative since August 2016. (*Id.*) Plaintiff requested gabapentin, and Elijah noted that gabapentin was not indicated at that time and

prescribed duloxetine (Cymbalta[17]) for joint pain to use with naproxen.[18] (*Id.* at 77.) Elijah noted that Plaintiff had been to interventional radiology twice for attempted percutaneous biopsies, but both procedures were cancelled due to proximity of the pulmonary artery. (*Id.* at 70.) Elijah entered a consultation request for an infectious disease specialist "for HBV treatment plan and management" and noted that she would request a pulmonology consultation to consider a bronchoscopic biopsy. (*Id.* at 77.) Elijah told Plaintiff she saw "no need for a biopsy" at that time. (Doc. 8 at 15.)

Elijah later noted that she spoke with Dr. Barnett on November 29, 2016 and learned that the pulmonologist had recommended repeat CT imaging to monitor the lung lesion and would determine "at that time if all surveillance efforts demonstrated changes" in the lesion. (Doc. 33-2 at 79.) On November 28, 2016, Facility Health Administrator K. Thomas responded to Plaintiff's grievance, stating that Elijah had requested that Plaintiff be scheduled for a "CT chest IV contrast to monitor right upper lobe lung mass." (Doc. 8 at 15.) On December 21, 2016, Plaintiff underwent a chest CT. (Doc. 33-4 at 24.) Plaintiff's lungs demonstrated mild hyperinflation, and there were bilateral areas of irregular increased interstitial markings, most confluent in the right lower lobe, which might have been from a persistent pneumonia versus areas of scarring or atelectasis. (*Id.*) There was a small soft tissue nodule, or lymph node, and the spiculated noncalcified upper lobe nodule seen on the prior chest CT was smaller. (*Id.*)

On January 13, 2017, Elijah sent a written "Health Services Communique" to Plaintiff, stating that they would discuss a possible neurology consultation at Plaintiff's next chronic care visit. (Doc. 8 at 11.) Elijah wrote in the January 13 Communique that Plaintiff's lesion was "shrinking" and was "considered to not be due to cancer and likely

---

[17] Cymbalta, a brand name for Duloxetine, is included in the class of drugs called selective serotonin/norepinephrine reuptake inhibitors. This class of drugs is used to treat depression, anxiety, and other mood disorders. *See U.S. Food & Drug Administration, Duloxetine (marketed as Cymbalta) Information*, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/duloxetine-marketed-as-cymbalta-information (last visited July 26, 2019).

[18] The record for the November 11, 2016 visit does not state the reason gabapentin was not indicated.

due to prior valley fever." (*Id.* at 15.)[19]  On March 10 and 15, 2017, Plaintiff submitted grievances, restating his need to see a neurologist and requesting a consultation. (*Id.*)  On May 2, 2017, Plaintiff saw Elijah for chronic care. (Doc. 33-2 at 60.)  Elijah noted that Plaintiff was "adamant" that he had disseminated Coccidioides and that he had skin lesions when he was hospitalized in the past. (*Id.*)  Plaintiff admitted that he had no new lesions since then, but he had scars from that "episode." (*Id.*)  Elijah explained to Plaintiff "extensively and repeatedly" that he did not have disseminated Coccidioides based on his described symptoms and that his blood test had been negative as of August 2016. (*Id.*)  Elijah offered to repeat the Coccidioides titers to reassure Plaintiff and informed him that if the labs were normal with Plaintiff being "off medication," then he did not have disseminated disease. (*Id.*)  Elijah also reminded Plaintiff of the result of the December 21, 2016 chest CT, which showed decreased size of the lesion to his right upper lobe, as we all as lung scarring. (*Id.*)

At the May 2 visit, Plaintiff also complained of neuropathic pain in his legs, stated that Cymbalta was not working, and asked to change back to gabapentin. (*Id.*)  Elijah told him gabapentin was not medically indicated at that time and declined Plaintiff's request for Lyrica for the same reason.[20] (*Id.*)  Elijah offered nortriptyline as an alternative to Cymbalta, which Plaintiff agreed to take. (*Id.*)  Elijah noted that she had personally witnessed Plaintiff ambulate into the office with his quad cane, but he was not using it to bear weight. Elijah informed Plaintiff of her observation, and Plaintiff stated that he had brief moments that required use of the cane for weight bearing and that his legs felt weak at such times. (*Id.*)  At this visit, Elijah informed Plaintiff that there was no longer a need for him to have a cane or a wheelchair, that she would "never" renew his gabapentin, and that she would not submit a request for a neurology consultation, suggesting that Corizon "would just deny her request." (Doc. 8 at 12.)

---

[19] Defendants do not mention a January 13, 2017 Health Services Communique, and Plaintiff did not submit the Communique as an exhibit.

[20] The record of the May 2, 2017 does not state the reason gabapentin and Lyrica were not medically indicated.

The Coccidioides titer performed on May 12, 2017 was "inconclusive" with "[q]uestionable presence of Coccidioides IgM antibody detected." (Doc. 33-4 at 10.) In a May 16, 2017 Health Services Communique, Elijah told Plaintiff he did not have evidence of active valley fever infection, although in the January 13, 2017 Communique, she had stated that the lesion was shrinking and was not considered to be due to cancer but rather was likely due to valley fever. (Doc. 8 at 15.) On May 18, 2017, apparently in response to a request from Plaintiff that Elijah renew Plaintiff's SNO for a wheelchair, Elijah noted that a wheelchair was "not to be renewed" because it was not medically indicated after Elijah personally observed Plaintiff ambulate without difficulty through the clinic while holding his quad cane off the ground. (Doc. 33-2 at 54.) A note dated May 16, 2017 indicates that the repeat Coccidioides test was negative. (*Id.* at 69.)

On May 31, 2017, Plaintiff saw Elijah for follow-up care. (*Id.* at 48.) Elijah informed Plaintiff that an Alternative Treatment Plan (ATP) put into place by "regional authorities" recommended a repeat chest CT one year from the previous chest CT to monitor Plaintiff's lung lesion. (*Id.*) Elijah reminded Plaintiff that ATPs were "not a result of [Elijah's] decision[]making and that it was not a refusal to adequately manage his conditions." (*Id.*) Elijah also reminded Plaintiff that his prior chest CT, which had occurred at the end of 2016, had demonstrated decreased size of the lung lesion and that pulmonology had recommended surveillance as an "appropriate option" in light of the anatomic limitations of the location of the lung lesion. (*Id.* at 48, 52.) Plaintiff and Elijah discussed why bronchoscopy and percutaneous biopsy would both have a risk of injury to the proximal pulmonary artery, and Plaintiff "verbalized his understanding of the information provided." (*Id.* at 48.)[21]

---

[21] None of the remaining Defendants treated or was otherwise involved in Plaintiff's medical care after May 31, 2017. Accordingly, the Court will omit discussion of the facts after that date.

## IV.    Discussion

### A.    Eighth Amendment Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted); *see also Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Deliberate indifference is a higher standard than negligence or lack of ordinary care for the prisoner's safety. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also*

*Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## B. Serious Medical Need

Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60. There is no dispute that Plaintiff's conditions qualify as serious medical needs. Plaintiff suffered respiratory failure, pneumonia, sepsis, and multiple organ failures, was on life support, and was hospitalized for nearly two months. Because this record shows a serious medical need, Plaintiff satisfies the objective prong of the deliberate indifference analysis. The decision in this matter therefore turns on whether Plaintiff has presented sufficient evidence for a reasonable jury to find that Defendants engaged in deliberate indifference.

## C. Deliberate Indifference

A plaintiff must first show that the defendant was "subjectively aware of the serious medical need[.]" *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017-18 (9th Cir. 2010) (quotation and citation omitted). The plaintiff must then show: (1) a purposeful act or

failure to respond to a prisoner's pain or possible medical need; and (2) harm caused by the indifference. *Jett*, 439 F.3d at 1096. A plaintiff may meet the harm requirement by demonstrating that the defendant's actions or policies exposed the prisoner to a "substantial risk for serious harm." *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014). A plaintiff does not need to "await a tragic event" before seeking a remedy. *Farmer*, 511 U.S. at 828.

### 1. Dannemiller and Smalley

#### a. Subjective Awareness

The parties dispute whether Dannemiller and Smalley were subjectively aware of Plaintiff's serious medical needs before his hospitalization on August 28, 2015. Plaintiff alleges in the First Amended Complaint and testified in his deposition that he submitted three HNRs between August 13 and August 28, 2015. (Doc. 8 at 5-8; Doc. 33-1 at 8-12.) Plaintiff claims in the First Amended Complaint that prisoner Simon and several other prisoners assisted him to the medical department to deliver an HNR to Dannemiller on August 18, 2015, which Dannemiller read while he "stood just inside." (*Id.* at 6.) Plaintiff alleges that prisoners Simon and Connelly hand-delivered an HNR to Nurse Wilder on August 24, 2015, and Wilder handed it to Smalley. (*Id.* at 7.) Finally, Plaintiff claims Connelly hand-delivered an HNR to Dannemiller on August 28, 2015. (*Id.* at 8.)

Plaintiff also testified at his deposition that he had at least one HNR in his file dated earlier than August 9, 2015. (Doc. 33-1 at 7.) Plaintiff further testified that he had "a habit of saving all [his] HNRs" and that he had "developed that [habit] after [he] was told … different times by medical." (*Id.*) Plaintiff stated he could give the HNRs to his attorney to make copies for Defendants' counsel. (*Id.*) [22]

Defendants argue that "there is no evidence" that Plaintiff submitted any such

---

[22] The transcript of Dannemiller's deposition indicates that Plaintiff's counsel stated that she knew Plaintiff had submitted "a lot" of HNRs, including one on August 17, 2015. (Doc. 33-1 at 30.) Defendants' counsel asked Plaintiff's counsel if she had the HNR for August 17, because Defendants' records did not contain any other HNRs to Dannemiller. (*Id.*) Plaintiff's counsel stated, "I don't – well, at least not in front of me. He has a lot of HNRs and I'm a little disorganized due to my situation this morning. I'm just going off of his notes and so I won't ask any follow-up questions about that. I may have them somewhere." (*Id.*)

HNRs.  (Doc. 32 at 20.)  They note that Plaintiff testified that he had a habit of keeping all HNR records, yet he "did not produce the mystery HNRs reportedly submitted after August 9, 2015."  (*Id.*)  Defendants assert that Plaintiff's counsel never disclosed any HNRs that were submitted between August 13 and 28, 2015.[23]  (Doc. 33 ¶ 73.)  Dannemiller testified in his deposition that he never personally accepted HNRs on the yard, and prisoners never tried to hand him HNRs in person.[24]  (Doc. 33-1 at 28.)  Dannemiller also testified that he did not receive any HNRs from Plaintiff on August 17, 2015, as Plaintiff alleged in the First Amended Complaint, or at any time between August 9 and 28, 2015.  (*Id.* at 30.)

Defendants further assert that Plaintiff gave conflicting testimony about his efforts to notify Dannemiller and Smalley of his declining health.  (Doc. 32 at 20.)  They contend that, even giving Plaintiff the benefit of the doubt that he "mixed up his dates, there is simply no way to reconcile all of the conflicting testimony."  (*Id.* at 21.)  Defendants argue that Plaintiff's deposition testimony "is not only internally inconsistent, but also inconsistent with the record."  (Doc. 38 at 3.)  Thus, Defendants contend, Plaintiff has not proven that Dannemiller and Smalley were ever consciously aware of an "*excessive risk*" to his health, that Defendants disregarded such a risk, or that either Dannemiller or Smalley drew an inference of a substantial risk of serious harm to Plaintiff.  (Doc. 32 at 21.)  (emphasis in original).

Whether Plaintiff submitted HNRs that advised Defendants of his deteriorating condition is a factual dispute that precludes the entry of summary judgment.  Although Plaintiff did not produce the HNRs, that does not exclude the possibility that he submitted them and did not receive or retain copies.

---

[23] Defendants do not assert that they ever followed up with Plaintiff's counsel concerning the HNRs.

[24] During his tenure with Corizon, Dannemiller's daily routine included picking up HNRs at the administrative officer "and then proceeding to the yard."  (Doc. 33 ¶ 9.)  Dannemiller processed HNRs, entered prescription refill requests for the provider to approve, and waited for the provider to arrive to start seeing inmates.  (*Id.* ¶ 10.)  HNRs were collected by pill call nurses and dropped off at the administrative office for collection the following morning.  (*Id.* ¶ 11.)

Defendants argue that the Court should find Plaintiff's claim that he submitted HNRs not credible because his deposition testimony was inconsistent. But credibility determinations are inappropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 255; *Deppe v. United Airlines*, 271 F.3d 1262, 1266 (9th Cir. 2000). In determining whether a party has presented facts sufficient to defeat a motion for summary judgment, "the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party." *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The Ninth Circuit in *Leslie* concluded that even when a reviewing court can "understand the district court's disbelief of [a party's] assertions in his deposition and sworn declaration, such disbelief cannot support summary judgment" in favor of the moving party. *Id.* at 1159.

Plaintiff's deposition testimony conflicts to some extent with his medical records and is at times internally inconsistent, but a reasonable jury could conclude that Plaintiff has simply misremembered the specific details of the events that led to his hospitalization. Moreover, the discrepancies between Plaintiff's deposition testimony and his medical records are not material. For instance, Plaintiff testified inconsistently about which provider he saw on which day, which prisoners assisted him to the medical department, how many times he hand-delivered an HNR, and whether he or another prisoner handed HNRs to Dannemiller. (Doc. 33-1 at 7-12.) These discrepancies do not shed light on the ultimate question: whether Plaintiff submitted additional HNRs between August 13 and 28, 2015 that informed Dannemiller and Smalley of Plaintiff's deteriorating condition. There is a genuine issue of material fact with respect to Dannemiller and Smalley's subjective knowledge of Plaintiff's medical condition between August 13 and 28, 2015.

### b. Response to Serious Medical Needs

Defendants argue that Dannemiller and Smalley "appropriately responded to and treated" Plaintiff's illness "based on his presentation." (Doc. 32 at 19.) Defendants contend that when Dannemiller saw Plaintiff, his temperature was normal, he was not in

distress, and he did not have shortness of breath or nasal congestion or drainage. (*Id.*) Defendants assert that his "only symptom" was a slightly diminished left lung. (*Id.*) They claim that between August 11 and 28, 2015, Dannemiller was "not consciously aware at any time of any deterioration in Plaintiff's medical condition." (*Id.*)

With respect to Smalley, Defendants argue that Plaintiff's main concern during his August 13, 2015 visit with Smalley was "reported chronic chills and myalgia (muscle pain), which Plaintiff attributed to his HBV treatment." (*Id.*) Defendants contend that Plaintiff was in no acute distress and "*was not ill appearing in any way.*" (*Id.*) (emphasis in original). Defendants further note that Plaintiff did not have an elevated temperature, his vital signs were stable, and he had no abnormal lung sounds. (*Id.*) Citing Smalley's deposition testimony, Defendants assert that Smalley ordered the valley fever screening because, in her experience, myalgia is a common symptom and indicator of valley fever. (*Id.* at 5.) They contend that Smalley determined that the screening "was not an immediate concern, mostly because of [Plaintiff's] myalgia and his complaints." (Doc. 33-2 at 207; Doc. 33-3 at 6.) Smalley testified at her deposition that she "always like[s] to do a screen for Valley Fever" when she "see[s] people with these certain complaints," but "it was not something that was considered an urgent test at that time as [Plaintiff] was not ill." (Doc. 33-3 at 6.) Defendants contend that Plaintiff "exhibited no symptoms which would or should have put [] Smalley on notice of a serious threat to his health." (Doc. 32 at 20.) They assert that Smalley did not order a chest x-ray because she did not believe it was indicated. (*Id.*) Defendants claim that after August 13, 2015, Smalley never received any information indicating Plaintiff's condition was deteriorating or that he was seriously ill. (*Id.*)

Taking Plaintiff's version of the disputed facts as true and drawing all inferences in Plaintiff's favor, Plaintiff submitted three HNRs that documented his worsening condition and otherwise sought medical attention in the 15 days between his visit with Smalley and his hospitalization. Assuming Plaintiff's condition made known to Dannemiller and Smalley was as Plaintiff described, their failure to act in response to Plaintiff's HNRs was

not reasonable. Accordingly, the Court finds there is a genuine dispute of material fact as to whether Dannemiller and Smalley were deliberately indifferent to Plaintiff's serious medical needs.

### c. Harm

Defendants further assert that Plaintiff has not proven injury attributable to any act or omission by Dannemiller or Smalley. (Doc. 32 at 21.) They contend that Plaintiff was not hospitalized until 15 days after his encounter with Smalley, and there is no evidence that either Smalley or Dannemiller was subjectively aware of any deterioration in Plaintiff's condition. (*Id.*) The Court has already determined that there is a genuine dispute of material fact with respect to whether Dannemiller and Smalley were deliberately indifferent to Plaintiff's serious medical needs. There is no dispute that Plaintiff suffered respiratory failure, sepsis, and multiple organ failures; was on life support for weeks; and he was hospitalized for nearly two months. These facts are sufficient for a reasonable jury to find that Plaintiff suffered genuine harm. The Court will deny Defendants' Motion for Summary Judgment as to Dannemiller and Smalley.

### 2. Elijah

Defendants do not dispute that Elijah was aware of Plaintiff's serious medical needs. Rather, they contend that Elijah was not responsible for some of the treatment decisions Plaintiff attributes to her, and that she responded reasonably to his medical needs. (Doc. 32 at 22-25.) In his response to Defendants' motion, Plaintiff did not address Defendants' arguments concerning Elijah's treatment. Defendants assert that because Plaintiff did not controvert any of their factual assertions with respect to Counts Two and Three of the First Amended Complaint or make any argument to preclude summary judgment on these counts, "Plaintiff has acknowledged there is no genuine issue of material fact to submit to a jury on Counts Two and Three." (Doc. 38 at 2.) As noted above, the Court cannot grant summary judgment by default. *See Heinemann*, 731 F.3d at 917. The Court must consider whether the evidence in the record warrants granting summary judgment in favor of Elijah.

### a. Neuropathic/Nerve Pain and Neurologist Consultation

Defendants contend there is no evidence that Elijah was deliberately indifferent to Plaintiff's nerve damage and physical limitations. (Doc. 32 at 22.) Defendants note that Plaintiff was only on gabapentin for four months before it was discontinued, and it was Dr. Barnett, not Elijah, who discontinued it. Defendants claim Dr. Barnett did so because Plaintiff "exhibited no objective signs of radiculopathy." (*Id.* at 12.) This characterization of Dr. Barnett's findings is not entirely accurate. Dr. Barnett noted in the Assessment Notes for the September 30, 2016 visit, "no evidence of radiculopathy." (Doc. 33-2 at 83.) It is unclear what "objective" signs of radiculopathy Plaintiff could have exhibited, and Defendants do not explain the significance of Dr. Barnett's finding of a lack of evidence of radiculopathy in September 2016 to Elijah's subsequent decisions concerning Plaintiff's treatment when she saw Plaintiff months later.[25]

Defendants assert that, given Plaintiff's objective presentation on November 11, 2016, Elijah "opined" that there was no indication for gabapentin. (Doc. 32 at 13.) Elijah testified at her deposition that gabapentin is "for neuropathy," which is usually "from diabetes," vascular injury, or trauma to the extremities. (Doc. 33-4 at 94.) Elijah agreed that "[p]eople may describe" pain as a symptom of neuropathy. (*Id.*) Elijah testified that joint and bone pain are not classic descriptions of neuropathy; rather, such pain is generally more consistent "with an arthritis type of picture" for which gabapentin is not "standardly used," and gabapentin is not a first-line medication for pain. (*Id.*) Defendants point out that Elijah offered Cymbalta to Plaintiff, which Elijah testified is "considered an alternative medication to be used for multiple things," including neuropathy. (*Id.* at 95; Doc. 32 at 13.) Elijah also testified that Cymbalta is a stronger medication for neuropathic pain than gabapentin. (Doc. 32 at 13; Doc. 33-4 at 95.) Defendants note that Plaintiff's medical chart is "devoid of a single mention or diagnosis of neuropathy, other than Plaintiff's

---

[25] According to the Mayo Clinic, radiculopathy, or a pinched nerve, occurs when too much pressure is applied to a nerve by surrounding tissues such as bones, cartilage, muscles, or tendons. This pressure disrupts the nerve's function, causing pain, tingling, numbness, or weakness. *See* https://www.mayoclinic.org/diseases-conditions/pinched-nerve/symptoms-causes/syc-20354746 (last visited July 24, 2019).

subjective representations." (Doc. 32 at 22.) They argue that Plaintiff has presented no evidence to support his claim of nerve damage, and, in any event, Elijah appropriately responded to Plaintiff's complaints of pain based on his objective presentation.[26] (*Id.*)

Defendants further assert that when Elijah discontinued Plaintiff's wheelchair on May 18, 2017, Dr. Barnett had returned Plaintiff to "full duty" status "almost a year earlier"—on August 2, 2016—and it had been nearly 21 months since Plaintiff had been hospitalized. (*Id.*) Defendants argue that Elijah did not believe a neurology consultation was indicated for Plaintiff's subjective complaints of joint and bone pain. (*Id.* at 23.) They assert that Plaintiff did not relay any symptoms that would indicate a potential neurological deficit, such as weakness, atrophy, muscular degeneration, or inability to carry out activities of daily living. (*Id.*)

As Defendants point out, on September 30, 2016, Dr. Barnett discontinued Plaintiff's gabapentin because she determined it was not indicated. (Doc. 33-2 at 84.) In addition, Elijah twice determined that gabapentin was not indicated—on November 11, 2016 and on May 2, 2017. (Doc. 33-2 at 60, 70, 77.) At the November 11, 2016 visit, Plaintiff complained of bone and joint pain, asked for gabapentin, and told Elijah he was "[u]nsure why it was taken away." (Doc. 33-2 at 70.) Elijah noted that she would "hold on gabapentin" because there was "no indication" for it and prescribed Cymbalta instead. (*Id.* at 77.) At the May 2, 2017 visit, Plaintiff complained of neuropathic pain and reported that Cymbalta was not working. (*Id.* at 60.) Elijah prescribed nortriptyline instead of Lyrica, which Plaintiff had also requested. (*Id.*)

The evidence does not support a conclusion that Elijah was deliberately indifferent to Plaintiff's serious medical needs with respect to his complaints of pain. The evidence

---

[26] Defendants do not cite to any portion of the record that describes the difference between radiculopathy, neuropathy, neuropathic pain, bone pain, and joint pain. According to the Mayo Clinic, peripheral neuropathy can result from damage to the nerves outside the brain and spinal cord and cause weakness, numbness, and pain, usually in the hands and feet, but also in other areas of the body. Peripheral neuropathy can result from diabetes, traumatic injuries, infections, metabolic problems, inherited causes, and exposure to toxins. *See* https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited July 24, 2019).

indicates that Elijah did not request a neurology consultation because, in her professional judgment, Plaintiff's complaints did not suggest neurological deficits. Elijah based her treatment on Plaintiff's presentation and her medical opinions about which medication was appropriate. As noted above, disagreement with medical treatment, negligence, or lack of ordinary care are not sufficient for deliberate indifference. *Farmer*, 511 U.S. at 835. The Court will grant Defendants' Motion for Summary Judgment with respect to Count Two.

### b. Bronchoscopic Biopsy

With respect to Plaintiff's claim that Elijah denied him a bronchoscopic biopsy, Defendants argue that by the time Elijah assumed Plaintiff's medical care on November 11, 2016, two attempts to biopsy Plaintiff's lung lesion were terminated because of the lesion's proximity to the pulmonary artery. (Doc. 32 at 24.) Dr. Raza recommended repeat CT scans to monitor the lung lesion, and Elijah entered a consultation request the same day she learned of Dr. Raza's recommendation. (*Id.*) The CT scan showed a decrease in the size of the lesion, most likely from partial resolution or a benign process such as valley fever or other infection. (*Id.*)

Elijah's decision not to obtain a lung biopsy does not rise to deliberate indifference. The record indicates that multiple attempts to biopsy Plaintiff's lung were made, but a biopsy could not safely be performed. In addition, follow-up chest CT scans showed the lesion had decreased in size, and, although Elijah's May 2017 request for a chest CT consultation was denied in favor of an Alternative Treatment Plan, there is no evidence that Elijah was in any way responsible for the denial. Elijah was not involved in Plaintiff's care after May 31, 2017. On this record, the Court finds there is no genuine issue of material fact with respect to whether Elijah was deliberately indifferent to Plaintiff's serious medical needs by failing to obtain a bronchoscopic biopsy. The Court will grant the Motion for Summary Judgment as to Elijah.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 32).

1    (2)    Defendants' Motion for Summary Judgment (Doc. 32) is **granted** as to

2    Defendant Elijah.  The Motion is **denied** as to Defendants Dannemiller and Smalley.

3    (3)    Elijah is dismissed as a Defendant.

4    (4)    This action is referred to Magistrate Judge Deborah M. Fine to conduct a

5    settlement conference.

6    (5)    Defense Counsel shall arrange for the relevant Parties to jointly call

7    Magistrate Judge Fine's chambers at (602) 322-7630 within 14 days to schedule a date for

8    the settlement conference.

9    Dated this 13th day of August, 2019.

David G. Campbell

_____

David G. Campbell
Senior United States District Judge